IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 27, 2021, at Knoxville

**STATE OF TENNESSEE v. JAMES YATES**

**Appeal from the Criminal Court for Shelby County**
**No. 18-02597          Chris Craft, Judge**

_____

**No. W2020-00706-CCA-R3-CD**

_____

A Shelby County jury convicted the defendant, James Yates, of aggravated robbery and assault.  Following a sentencing hearing, the trial court imposed an effective sentence of thirty years in confinement.  On appeal, the defendant challenges the sufficiency of the evidence to support his convictions and argues the trial court erred in denying his motion to suppress.  After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.  However, we remand the case for entry of a judgment form in count 2.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Remanded**

J. ROSS DYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Phyllis L. Aluko, Shelby County Public Defender; Tony N. Brayton, Assistant Public Defender (on appeal); and Michael Johnson and Angela Smith, Assistant Public Defenders (at trial), for the appellant, James Yates.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On January 2, 2018, a masked man robbed the Dollar Tree at 3060 Thomas Street in Memphis, Tennessee, and witnesses gave responding officers the offender's physical

description.  The defendant, whose appearance matched the description of the suspect, was apprehended nearby, and the witnesses identified the defendant by way of a "show-up" identification shortly after the crime.  Prior to trial, the defendant filed a motion to suppress the "show-up" identifications, and the trial court conducted a pre-trial hearing on December 2, 2019.

## I.      Motion to Suppress

In his motion to suppress, the defendant argued that the identifications were obtained through an unnecessarily suggestive procedure and that the witnesses made their identifications in the presence of each other.  The State disagreed and presented the following evidence supporting its position at the suppression hearing.

Officer Brandon Roberts with the Memphis Police Department ("MPD") testified he and his partner, Officer Timothy Brown, responded to an armed robbery call at the Dollar Tree on January 2, 2018.  Because they were writing parking tickets down the street from the Dollar Tree at the time of the robbery, Officers Roberts and Brown arrived on the scene within minutes of the 911 call.  Witnesses at the store described the perpetrator as a tall "male black wearing a mask."  Then, as Officers Roberts and Brown began searching the area for suspects, they observed the defendant emerge from behind a closed TitleMax store across the street from the Dollar Tree.  The defendant was wearing only jeans and a red t-shirt, which was suspicious because it was a cold night.  Officers Roberts and Brown attempted to approach the defendant, but he walked briskly toward a nearby Tops Bar-B-Q and entered through the front door.

Because Officers Roberts and Brown were afraid the defendant would attempt to flee through the back door, they pulled their squad car into the rear parking lot and entered through the restaurant's back door.  When they entered the restaurant, the defendant, who was walking toward them, quickly entered the restroom to his left.  Officer Roberts opened the restroom door and observed the defendant standing at the sink splashing water on his face.  Officer Roberts ordered the defendant to exit the restroom and frisked him for weapons.  The defendant was then placed in the back of the squad car while Officers Roberts and Brown returned to the restaurant to search for evidence.  Officer Roberts re-entered the restroom and observed a small garbage can, with the trash bag askew.  Upon lifting the trash bag, Officer Roberts observed a small green and white potato chip bag containing cash.

On cross-examination, Officer Roberts acknowledged he also saw another man across the street from the Dollar Tree following the robbery.  However, because the man was talking on his cell phone and did not appear suspicious, Officer Roberts did not speak with him.  Officer Roberts also agreed that he relayed information to responding officers

at the Dollar Tree regarding the defendant and recovered evidence prior to the defendant's "show-up" identifications.

Officer Justin Murray with the MPD responded to the robbery call at the Dollar Tree at 6:45 p.m., within one minute of the 911 call. Upon arriving at the scene, Officer Murray immediately approached the nearest employee and asked for a description of the perpetrator, and at 6:52 p.m., he was informed that a suspect matching the witness's description had been detained.

Approximately fifty minutes after the robbery, the defendant was brought to the Dollar Tree, removed from the police car, and placed in the parking lot for a "show-up" or "single shot" identification by the employees. During the identifications, the defendant was illuminated with flashlights and spotlights, while the witnesses remained inside the store.

On cross-examination, Officer Murray agreed that he did not separate the witnesses upon arriving on the scene or at any time prior to the identifications. He confirmed that the only time the witnesses were separated was when they stepped up to the store window to identify the suspect. Officer Murray also acknowledged MPD policy was to separate witnesses in order to ensure their identifications were not influenced by each other. However, he stated that he could not force the witnesses to stay in one spot because they had not committed a crime. Officer Murray also agreed that he discussed the fact that a suspect had been apprehended and that a gun was found near the scene while the witnesses stood a few feet from him.

Marcee Williams was working as a cashier at the Dollar Tree on the night of January 2, 2018. During the robbery, Ms. Williams was within arm's reach of the perpetrator and described him to police officers as tall with caramel colored skin. His face was covered, and he had "a sweat suit type thing on." When the defendant was brought to the store later that evening, Ms. Williams identified him as the perpetrator. Although she had never seen the perpetrator's face, Ms. Williams knew the defendant was the same person because of his height, skin tone, and clothing. At the hearing, the defendant stood up, and Ms. Williams again identified him as the person who robbed the Dollar Tree that night.

On cross-examination, Ms. Williams agreed that her interaction with the perpetrator lasted approximately sixty seconds and that his entire body was covered during the robbery except for his eyes. She also agreed Jasmin Carroll, her co-worker, gave the initial description of the suspect to the police, and Ms. Williams was standing next to Ms. Carroll during that time. Officers did not separate Ms. Williams from the other witnesses or ask them not to discuss the robbery, and Ms. Williams acknowledged she and Ms. Carroll discussed what had happened while waiting for the suspect to be brought to the store. Ms.

Williams also testified that, prior to her identification, officers disclosed that a suspect was discovered inside Tops Bar-B-Q and that items from the robbery had been recovered. During the identification, Ms. Williams was standing next to Ms. Carroll and could hear her identify the defendant as the perpetrator. Ms. Williams acknowledged that she was unable to identify the defendant during his preliminary hearing because there were multiple men sitting together, and she could not see their height or body type.

Jasmin Carroll was an assistant manager at the Dollar Tree on the night of the robbery. Ms. Carroll was walking down an aisle when she noticed the defendant acting suspiciously. As she approached the defendant, he gave her a bag and told her to put the money from the cash register in it. Ms. Carroll took the bag to Ms. Williams and told her to put the money from the cash register into the bag. The defendant, who was within arm's reach of Ms. Carroll, placed a gun against her hip while Ms. Williams put the money into the bag.

Ms. Carroll gave a description of the perpetrator to the police, and when the defendant was brought to the store that evening, Ms. Carroll identified him based on his pants and his height. She acknowledged that she was unable to identify the defendant during the preliminary hearing because everyone was sitting down.

On cross-examination, Ms. Carroll agreed that she and Ms. Williams were not separated at any time following the robbery and were standing next to each other when they gave the police the perpetrator's description. She also acknowledged the police told her that a possible suspect had been discovered in the restroom of Tops Bar-B-Q and that officers had recovered the stolen money, a gun, and a mask. Although she could not recall specifically whether Ms. Williams was standing next to her when she made her identification, she acknowledged it was "chaos."

After its review, the trial court denied the defendant's motion to suppress the identifications, finding that there were "imperative circumstances which necessitated the show[-]up" and that the identifications occurred as an on the scene investigatory procedure. The defendant then proceeded to trial.

## II.    Trial

The evidence produced at trial showed that on the evening of January 2, 2018, Ms. Carroll was working at the Dollar Tree and observed the defendant, who was wearing a hat, tan jacket, and camouflage mask, "hovering around . . . a stack of boxes." Because the defendant looked suspicious, Ms. Carroll walked toward him to see what he was doing. After she passed the defendant, he approached her from behind, put a gun against her hip, and demanded she fill a potato chip bag with the money from the cash register.

- 4 -

Ms. Carroll then approached Ms. Williams, who was working as a cashier, and asked her to put the money in the potato chip bag. Ms. Williams asker her if she was serious, and Ms. Carroll indicated she was. At that point, the defendant approached the women and told them they had ten seconds to put the money in the bag. Ms. Williams emptied the register and handed the defendant the bag, which contained approximately $300. As the defendant left the store, he said, "Happy New Year, b*****s." Ms. Carroll then immediately called 911.

Officers Roberts and Brown responded to the 911 call and arrived on the scene within minutes of the robbery. When they arrived at the store, other officers had obtained a description of the perpetrator from the witnesses, and Officers Roberts and Brown began to search the area for suspects. As they pulled out of the Dollar Tree parking lot, they observed a man on the sidewalk talking on his cell phone. However, because the man did not fit the description of "tall and thin" and did not appear to be fleeing the scene, Officers Roberts and Brown did not approach him.

Across the street from the Dollar Tree, Officers Roberts and Brown observed the defendant appear from behind a closed TitleMax store wearing only jeans and a red t-shirt. When the defendant noticed the officers, he hurriedly walked away from them and entered the Tops Bar-B-Q next door. As the defendant entered the restaurant, he was greeted by an employee, Leann Collins. Ms. Collins asked the defendant how he was doing and commented that it was too cold outside for him to be without a jacket. The defendant told Ms. Collins that he was going to place an order but wanted to use the restroom first, and Ms. Collins pointed him in the direction of the restroom.

Meanwhile, Officer Roberts was concerned the defendant would attempt to flee out of the back door, so he pulled the squad car into the rear parking lot, and he and Officer Brown entered the restaurant through the back door. When the defendant saw the officers, he immediately went into the restroom, which was to his left. Officer Roberts opened the door and observed the defendant drinking water from the sink. Officer Roberts asked the defendant to come into the hallway, frisked him for weapons, and placed him in the back of the squad car. Officer Roberts then returned to the restroom and noticed the trash bag in a small garbage can was askew. He picked up the trash bag and saw a small potato chip bag full of cash in the bottom of the garbage can. Additionally, a BB gun was located under the ice machine near the restroom.

Because Officer Roberts was confident the defendant was involved in the robbery, he returned to the area where the defendant was first spotted and discovered a glove and jacket, which matched the description from the witnesses, in a dumpster behind the

TitleMax. In a nearby vacant lot, Officer Roberts also located a red hat and camouflage mask lying on the ground.

Approximately fifty minutes after the robbery occurred, Officers Roberts and Brown were asked to bring the defendant to the parking lot of the Dollar Tree to perform a "show-up." The defendant, who was handcuffed, stood outside the squad car while the witnesses remained inside the store. Officers used spotlights and flashlights to illuminate the defendant, and the witnesses took turns stepping up to the front window to identify him. Ms. Carroll was able to identify the defendant because he was wearing the same jeans as the perpetrator and was tall. Likewise, Ms. Williams knew he was the same person because he was wearing some of the same clothing and was the same height and body type.

Detective Nick Segich with the MPD's Violent Crimes Unit was assigned to lead the investigation. The day following the robbery, Detective Segich presented Ms. Collins with a photographic lineup containing the defendant. Although Ms. Collins identified someone other than the defendant in the lineup, surveillance video taken from the Tops Bar-B-Q confirmed that it was indeed the defendant who had entered the restaurant that night.

Following the defendant's arrest, Lindsey Flores, a criminalist with the MPD, obtained buccal swabs from the defendant for comparison with the evidence collected from the crime scene. Special Agent Christie Smith, a DNA analysis expert and forensic scientist with the Tennessee Bureau of Investigation ("TBI"), analyzed several pieces of evidence found at the crime scene, including the BB gun, hat, glove, and face mask. Her examination of the BB gun revealed the presence of a DNA profile which was consistent with a mixture of two individuals, one of which was male. However, because the profile was limited, Agent Smith was unable to include or exclude any individuals. The hat and glove contained a mixture of at least three individuals, with the major contributor profile matching the defendant's DNA profile. Likewise, the face mask contained a mixture of at least two people, with the major contributor profile matching the defendant.

On cross-examination, both Ms. Carroll and Ms. Williams agreed they were not separated by police following the robbery, including the time during which they made their identification of the defendant. They also agreed police officers informed them that a possible suspect had been detained at the Tops Bar-B-Q prior to being asked to identify the defendant. Although both Ms. Williams and Ms. Carroll agreed they were unable to identify the defendant at the preliminary hearing, Ms. Carroll stated she could not see anyone's height and build because they were sitting down, and Ms. Williams testified there were several people to choose from and, because no one was asked to stand up, she could not determine their height or weight.

- 6 -

In addition to the testimony of Ms. Carroll and Ms. Williams, the State presented the testimony of Ms. Roshundra Mull and Ms. Makeva Jeffries. Ms. Mull worked at the Thomas Street Dollar Tree store as the store manager. On January 2, 2018, Ms. Carroll called Ms. Mull to inform her the robbery. Upon arriving at the store, Ms. Mull discovered that the defendant had stolen between $240 and $300 in cash. After speaking with the police about the robbery and providing them with the recording from the store's security cameras, Ms. Mull went across the street to the Tops Bar-B-Q restaurant, where officers asked her some additional questions and returned to her a portion of the money stolen from the Dollar Tree store. When the defendant was brought back to the Dollar Tree store, Ms. Mull was able to identify him as the robber based on the recording from the store's security cameras.

Ms. Makeva Jeffries recalled that on January 2, 2018, she was "at Dollar Tree with [her] daughter shopping when a man came up to the register to rob the place." She described the robber as an African American man with a "tall, thin build." The robber's "face [was] covered with a [camouflage] mask and a skull hat" so that Ms. Jeffries could only see his eyes. After Ms. Carroll told Ms. Williams to put the money in the defendant's bag, Ms. Jeffries "took [her] daughter and pushed her toward the back of the store." Ms. Jeffries could not determine whether the robber had a weapon, but she could tell the situation was serious. She identified the hat and camouflage mask the defendant had been wearing. She also later identified the defendant when he was returned to the Dollar Tree store for the show-up identification.

The defendant testified on his own behalf, asserting that on the night of the robbery he was driving his sister's car when it began to experience engine problems. He pulled over near the Tops Bar-B-Q to allow the car to cool down, and as he was looking at his phone, a man wearing a long, dark sweater knocked on his window and asked for a hat. The defendant had an extra hat on his dashboard, so he handed the man the red beanie. The man thanked him and began walking toward the Dollar Tree.

Approximately ten minutes later, the defendant saw a man, who may have been the same person who asked for the hat, run behind the TitleMax. As he was running, the man dropped something. When the defendant could no longer see the man, he got out of the car and observed a brown sack on the ground. He opened the sack and discovered a gun and a small bag. He placed the bag in his back pocket and the gun in his waistband. Because he did not intend to be out of the car for long, the defendant did not put his coat on before exiting the car. As he was walking around the corner, he saw the man near a dumpster. The man opened the lid, but the defendant was unable to see if the man placed anything in the dumpster.

- 7 -

The defendant began walking towards the Tops Bar-B-Q and saw a car approach him but did not realize it was a police car until he was entering the restaurant. The defendant knew he needed to get rid of the items he had picked up because he did not want to be caught with a gun that was not his. The defendant asked the woman behind the counter where the restroom was, and as he walked down the hall, he placed the gun under the ice machine. When he entered the restroom, he took the bag from his back pocket and placed it in the trash can. He was washing his hands when police officers entered the restroom and patted him down.

The defendant was then placed in the back of the squad car and remained there until he was taken across the street to the Dollar Tree. At that time, Officer Roberts had the defendant step out of the car and shined a light in his face. The defendant denied having anything to do with the robbery and insisted he was telling the truth about that night. The defendant acknowledged having a prior conviction for aggravated robbery in 1982 when he was eighteen years old.

On cross-examination, the defendant denied knowing there was money in the bag that he placed in the trash can. When asked about the glove and face mask, the defendant insisted they were tangled together with the red beanie, and he must have handed all of them to the man who knocked on his window.

Following deliberations, the jury found the defendant guilty of aggravated robbery as charged in the indictment and the lesser-included offense of assault, and the trial court subsequently sentenced the defendant to an effective sentence of thirty years in confinement at 100%. The defendant filed a motion for new trial which the trial court denied. This timely appeal followed.

*Analysis*

On appeal, the defendant argues that the trial court erred in denying his motion to suppress and that the evidence presented at trial was insufficient to support his convictions. The State contends that the trial court properly denied the motion to suppress and that the evidence is sufficient.

I.    **Motion to Suppress**

The defendant challenges the trial court's denial of his motion to suppress the witnesses' identifications during a pre-trial show-up. Specifically, the defendant argues the identifications were made "under circumstances that focused the witnesses' attention on him as the person the police believed committed the robbery." The State responds that the trial court correctly concluded the show-up was proper.

Suppression issues on appeal are subject to a well-established standard of review. Appellate courts are bound by a trial court's findings of facts determined after a suppression hearing unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Matthew T. McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2 (Tenn. Crim. App. Sept. 13, 2012). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Appellate courts should consider the entire record, affording the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence." *Matthew T. McGee*, 2012 WL 4017776, at *2 (citing *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001)); *see also State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). However, applying the law to the factual findings of the trial court is a question of law, which is reviewed *de novo* on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

A witness's identification of a suspect "must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998). Although this Court has noted that "[o]ne-to-one lineups are condemned and their use is highly suspect," show-up identifications remain permissible under the proper circumstances. *Marsh v. State*, 561 S.W.2d 767, 769 (Tenn. Crim. App. 1977) (citing *Stovall v. Denno*, 388 U.S. 293 (1967)). Generally, show-up identifications are prohibited unless "imperative circumstances . . . necessitate a show[-]up, or . . . the show[-]up occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." *State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989) (internal citations omitted). "It is the likelihood of misidentification that violates due process and renders [an] identification inadmissible." *State v. Philpott*, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994).

In determining whether an out-of-court identification is so impermissibly suggestive as to violate due process, trial courts should consider the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 199 (1972). The relevant factors include

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200. If a show-up identification is so impermissibly suggestive that it violates due process, the show-up identification and the in-court identification are inadmissible. *Id.* at 199.

In the present case, the "show-up" identifications, while clearly suggestive, were not unnecessarily so because they were part of an ongoing and uninterrupted investigation conducted close in time and location to the crimes. The police responded within one minute of the 911 call and approximately eight minutes later observed the defendant, who matched the description of the perpetrator, behind a closed business across the street from the Dollar Tree. The defendant was not wearing a coat, which was suspicious because it was a cold night. When the defendant observed the police car, he quickly walked to the nearby Tops Bar-B-Q and hid in the restroom. He was detained less than ten minutes after the 911 call, and both the BB gun and the potato chip bag containing the stolen money were found within feet of the defendant's location. Approximately fifty minutes after the robbery, the defendant was brought back to the Dollar Tree, and both Ms. Williams and Ms. Carroll identified him as the perpetrator. Ms. Williams identified the defendant by his height, build, and clothing, and Ms. Carroll identified him by his height and clothing.

The "show-up" identifications, which were conducted at the Dollar Tree within an hour of the robbery, were used as an on the scene investigatory tool by law enforcement and were necessary to determine the continued course of their investigation. Because the identifications were necessary to the officers' immediate investigation, the trial court did not err in determining that the evidence could be admitted without offending due process despite the fact they may have been suggestive. Additionally, at trial, the defendant was able to demonstrate through cross-examination that the witnesses' identifications were based only on height, weight, and clothing. The jury was aware that the witnesses never saw the defendant's face and could not identify him by his facial features. We conclude the trial court properly denied the defendant's motion to suppress the pretrial and in-court identifications, and the defendant is not entitled to relief on this issue.

## II.    Sufficiency

The defendant argues the evidence at trial is insufficient to support his convictions for aggravated robbery and assault. Although the defendant does not dispute a robbery occurred, he argues the State failed to establish his identity as the perpetrator. Specifically, the defendant contends the only evidence linking him to the robbery is the "unreliable identifications made by the witnesses." The State contends the evidence is sufficient to support the defendant's convictions.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether

- 10 -

by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The burden is on the State to prove the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Cribbs*, 967 S.W.2d 773, 779 (Tenn. 1998). The identification of the defendant as the perpetrator is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005)).

As charged in this case, "[r]obbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). An aggravated robbery is a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." *Id.* § 39-13-402(a)(1). Assault occurs when a person intentionally or knowingly causes another to reasonably fear imminent bodily injury. *Id.* § 39-13-101(a)(2).

Here, the evidence showed that the defendant, armed with a BB gun, entered the Dollar Tree and demanded the money from the cash register. Both Ms. Williams and Ms. Carroll identified the defendant as the perpetrator in a "show-up" conducted within one hour of the robbery. At both the suppression hearing and trial, Ms. Williams and Ms. Carroll again positively identified the defendant as the man who robbed the Dollar Tree and did not waver in their identifications despite vigorous cross-examination by the defendant. Additionally, the defendant was identified by Ms. Mull and Ms. Jefferies. Although the defendant argues the identifications were unreliable because the witnesses did not see the perpetrator's face and were unable to identify the defendant at the preliminary hearing, the jury resolved any inconsistencies in testimony in favor of the State, and we will not second-guess the jury in the resolution of any conflicts in the proof. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Moreover, near the area where the defendant was located, officers discovered clothing, including a jacket, hat, mask, and glove, which matched the description given by witnesses, and the hat, mask, and glove contained the defendant's DNA. Accordingly, this evidence is sufficient to support the defendant's conviction, and the defendant is not entitled to relief on this issue.

## III.    Judgment Form

Finally, we note that the record does not include a judgment form for count 2. At the sentencing hearing, the trial court imposed a sentence of eleven months, twenty-nine days for count 2 to be served concurrently with count 1. Therefore, the case must be remanded, and the trial court should, on remand, enter a judgment form reflecting the disposition of count 2. *See State v. Davidson*, 509 S.W.3d 156, 217 (Tenn. 2016) (requiring a trial court to prepare a uniform judgment document for each count of the indictment).

### *Conclusion*

For the aforementioned reasons, the judgments of the trial court are affirmed. However, we remand this case for entry of a judgment in count 2 as specified in this opinion.

_____
J. ROSS DYER, JUDGE

- 12 -